## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: IN THE MATTER OF            CIVIL ACTION
AMERICAN COMMERCIAL
BARGE LINE, LLC                        NO. 22-502

                                            SECTION: D (1)

## ORDER and REASONS

Before the Court is a Motion to Dismiss Pursuant to Rule 12(B)(6) and Alternatively, a Motion for Summary Judgment, filed by Victor Allen, Peter Dearing, Michael Bellard, and Bryan Giroir (collectively, the "Claimants").[1] American Commercial Barge Line, LLC ("ACBL"), opposes this Motion,[2] and Claimants filed a Reply.[3] After careful consideration of the parties' memoranda, the record, and the applicable law, the Court **DENIES** the Motion.

## I.    FACTUAL and PROCEDURAL BACKGROUND

On February 25, 2022, American Commercial Barge Line, LLC ("ACBL"), as owner and operator of the barges STC 2717, STC 2715, COA 1104B, JPW 129, MM 26, MM 27, and EMS 1 (collectively, the "Barges"), filed a Verified Complaint for Exoneration From or Limitation of Liability in this Court stemming from a collision that occurred on or about August 29, 2021 as a result of Hurricane Ida.[4] ACBL alleges that the Barges "comprise a Wash Dock in Convent, Louisiana measuring

---

[1] R. Doc. 4.
[2] R. Docs. 7 & 13.
[3] R. Doc. 16.
[4] R. Doc. 1.

approximately 1,714 feet in length and 54 feet in width."[5]  ACBL asserts that on August 29, 2021, the Barges "were all securely moored" at ACBL's facility in Convent, Louisiana when Hurricane Ida made landfall in Louisiana.[6]  According to ACBL, in the afternoon of August 29, 2021, as the eye of Hurricane Ida approached Convent, Louisiana, the Barges broke free of their moorings as a result of the severe weather and allegedly came into contact with certain vessels and other property along the Mississippi River.[7]  ACBL alleges that the Barges were damaged as a result of the incident, that they were valued at $945,000 at the close of their voyage, and that there was no pending freight recovered or recoverable in the incident.[8]  As such, ACBL sought exoneration from liability for any and all injuries, deaths, losses, or damages occurring as a result of the incident.[9]

That same day, February 25, 2022, the Court issued an Order Directing Issuance of Notice and Restraining Prosecution of Claims.[10]  The Court accepted the Declaration of Andrew Minster stating that the value of ACBL's interest in the Barges is $945,000, and accepted the Letter of Undertaking by Starr Companies in the amount of $945,000, with interest at the rate of six percent annum, as stipulation for value for the purposes of the limitation proceedings and approved them as to form, quantum, and surety.[11]  The Court further ordered that a notice be issued by the Clerk of Court "to all persons asserting claims with respect to which the Complaint

---

[5] *Id.* at ¶ 3.
[6] *Id.* at ¶ 5.
[7] *Id.* at ¶ 7.
[8] *Id.* at ¶ 8.
[9] *Id.* at ¶¶ 5-7 & 19.
[10] R. Doc. 3.
[11] R. Doc. 3 at p. 2.

seeks exoneration or limitation, admonishing them to file their respective claims with the Clerk of this Court in writing, and to serve on counsel for [ACBL] a copy thereof on or before August 26, 2022, or be forever and permanently defaulted . . . ."[12] Furthermore, the Court ordered that, "any and all actions, suits and proceedings" against ACBL, or against the Barges, or against any property of ACBL, "except in this action, to recover damages for or in respect of any injury, loss, or damages allegedly caused by or resulting from the aforesaid incident that occurred on or about August 29, 2021," are restrained, stayed, and enjoined "until the hearing and final determination of this action."[13]

Victor Allen, Peter Dearing, Michael Bellard, and Bryan Giroir (collectively, the "Claimants"), filed the instant Motion on May 13, 2022.[14]  Claimants allege that Bellard was the captain and Allen, Dearing, and Giroir were crewman aboard the M/V OVIDE J, one of the vessels with which ACBL's Barges collided.[15]  Based upon the injuries sustained as a result of the incident, Claimants filed suit in the Twenty-Third Judicial District Court for the Parish of St. James, State of Louisiana pursuant to the Jones Act, general maritime law, and Louisiana law against their employer and the owner of the M/V OVIDE J, Enterprise Marine Services, LLC, as well as Associated Terminals, LLC, another company whose barges broke loose during Hurricane Ida.[16]  Claimants allege that by filing this limitation action, ACBL sought

---

[12] *Id.* at p. 3.
[13] *Id.* at pp. 3-4.
[14] R. Doc. 4.
[15] R. Doc. 4-1 at p. 2.
[16] *Id.*

to, and did in fact, prevent them from naming ACBL in their petition for damages in state court.[17]

Claimants contend that ACBL's filing of this limitation action was an obvious attempt to "deprive insured seaman [sic] of their right to choose a forum under the Savings to Suitors Clause in the Jones Act."[18] Claimants point out that ACBL admits in its Verified Complaint that the Barges comprise a wash dock (the "Wash Dock").[19] Claimants assert that the Wash Dock consists primarily of a floating dock comprised of a number of "spar barges," which are permanently moored to fixed dolphins so that other barges may be moored to them.[20] Claimants argue that the Verified Complaint contains no allegations that the Barges were ever used for any other purpose, or that they ever moved from their fixed position except when they broke loose during Hurricane Ida.[21] Claimants note that the Verified Complaint also contains no allegations that the Barges are capable of self-propulsion, have a steering mechanism or rudder, have a raked bow, or carried cargo or people from place to place.[22] Claimants contend that ACBL is not entitled to limitation because the Limitation of Shipowners' Liability Act only applies to vessels, and the Barges are not vessels under maritime law.[23] Relying upon precedent from the Supreme Court and the Fifth Circuit, Claimants argue that the Verified Complaint fails to establish that ACBL's

---

[17] *Id.*
[18] *Id.*
[19] *Id.* (*citing* R. Doc. 1 at 1 at ¶ 3); R. Doc. 4-1 at p. 8 (*citing* R. Doc. 1 at ¶ 3).
[20] R. Doc. 4-1 at p. 2 (*citing* 33 C.F.R. § 165.803(a)(5)).
[21] R. Doc. 4-1 at p. 8.
[22] *Id.* (*citing* R. Doc. 1-3 at p. 4; *Baker v. Director, Officer of Workers' Comp. Programs*, 834 F.3d 542, 547 (5th Cir. 2016)).
[23] R. Doc. 4-1 at p. 2.

Barges are vessels because it does not allege that the permanently moored Barges are designed or regularly used for transportation over water, and merely asserts the legal conclusion that the Barges are vessels with no supporting allegation or evidence.[24]

Claimants further assert that the survey attached to the Verified Complaint contains additional facts that clearly show the Barges are not vessels.[25] According to Claimants, the survey shows that the Barges were "moored together bow to stern to be used as a cleaning and repair facility that is accessible through two separate locations on the river levee."[26] Claimants assert that the survey also shows that Barge STC 2717 contained "a 40 foot modular office building . . . a skid mounted generator, and multiple overhead wires . . . send electricity to the barge from standard transmission poles."[27] Additionally, Claimants reference "[p]ublic records and permits," which they claim "further support that the wash dock and its floating components are a *stationary* facility and *not vessels*."[28] Claimants assert that, "As early as the mid-1980s prior operators," including Convent Marine Companies, Inc., "had a barge washing facility at that location."[29] Claimants further contend that permits issued as "early as 1989 describe a 'permanently moored barge or drydock' as part of the facility."[30] Claimants assert that, according to public records, "[b]y the

---

[24] *Id.* at pp. 4-8 (citing authority).
[25] *Id.* at p. 8 (*citing* R. Doc. 1-3).
[26] R. Doc. 4-1 at p. 8 (*citing* R. Doc. 1-3 at p. 4).
[27] R. Doc. 4-1 at p. 9 (*citing* R. Doc. 1-3 at p. 4; *Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 22, 46 S.Ct. 379, 70 L.Ed. 805 (1926) ("connections with the water, electric light, and telephone systems of the city evidence a permanent location").
[28] R. Doc. 4-1 at p. 9 (*emphasis added*).
[29] *Id.* at p. 9 (*citing* R. Doc. 4-3 at p. 10).
[30] R. Doc. 4-1 at p. 9 (*citing* R. Doc. 4-3 at p. 21).

late 1990's a prior owner of the wash dock . . . sought approval to permanently install additional spar barges at the site to expand the . . . facility."[31]  Claimants contend that, "[a]lthough the dock has been expanded since the 1999 site plan was submitted into the public records, it clearly shows that the permitted wash facility was secured to land with multiple permanent anchors, dolphins, and shore wires."[32]  Claimants claim that, "the permits related to the facility . . . were transferred to ACBL Transportation Services, LLC" in 2016.[33]  Claimants argue that "[t]hese facts further prove that the purpose and designs of these barges was not for transportation over water, but instead, to be used as a fixed wash dock facility."[34]  Claimants thus allege that "ACBL is not entitled to any relief under the Limitation of Shipowners' Liability Act," because "these barges were not vessels."[35]

Alternatively, Claimants assert that they are entitled to summary judgment and dismissal of ACBL's Verified Complaint based upon the documents attached to their Motion.[36]  Those documents include a motion for summary judgment filed in another case by AEP River Operations, LLC ("AEP"), the predecessor in interest to ACBL, regarding the Barges at issue in this case.[37]  In that motion, AEP argued that "the cleaning and repair facility consisted of three docks that 'were permanently affixed to the shore and floated on the river near the bank,' and thus, the plaintiff

---

[31] R. Doc. 4-1 at p. 9 (*citing* R. Doc. 4-4 at p. 9).  "At the time," the prior owner of the Wash Dock, "requested the placement of numerous permanent shore wires, anchor piles, and dolphins to support six spar barges." R. Doc. 4-1 at p. 9 (*citing* R. Doc. 4-4 at p. 9).
[32] R. Doc. 4-1 at pp. 9-10 (*citing* R. Doc. 4-4 at p. 12).
[33] R. Doc. 4-1 at p. 10 (*citing* R. Doc. 4-5).
[34] R. Doc. 4-1 at p. 10.
[35] *Id.*
[36] *Id.* at p. 11.
[37] *Id.* (*citing* R. Doc. 4-6 at pp. 35-36).

was not assigned to any vessel or fleet of vessels."[38]  Claimants argue that there is a clear discrepancy between AEP's past categorization of the Barges and ACBL's current position.[39]  Claimants also submitted a marine surveyor's report prepared by Matthew Knoll,[40] in which he notes that the Wash Dock was "typically used as a permanent structure to moor" barges and boats.[41]  Claimants point out that Knoll further asserts in his report that, "electrical power was routed to the first barge, STC 2717, through overhead power lines, which then entered a distribution box," which, "distributed electricity to the rest of the wash dock."[42]  Claimants highlight that Knoll "observed that '[t]he dock, and the barges which make up the dock, do not feature propulsion,'" and thus, "the barges are not capable of navigation without significant efforts to disassemble their permanent moorings and utilities."[43]  Claimants contend that, according to Knoll's report, the Barges, which held "offices, tools, vessel repair materials and personnel," were not used to "transport cargo, or materials, or personnel," but instead, "to serve as a permanent workplace" for workers to clean and repair vessels.[44]  Claimants assert that Knoll concluded in his report that, "the wash dock is a dock, and *not* a vessel."[45]  Claimants assert that they are entitled to summary judgment because "every fact, including ACBL's own complaint and

---

[38] *Id.* (*quoting* R. Doc. 4-6 at p. 34).

[39] *Id.* at p. 12 (*citing* R. Doc. 4-6 at pp. 34-36).

[40] Matthew Knoll is "a NAMS certified marine surveyor with a USCG license as a 100 ton master and 14 years of experience conducting marine surveys." *Id.* (*citing* R. Doc. 4-8).

[41] R. Doc 4-9 at p. 2.

[42] R. Doc. 4-1 at p. 12 (*citing* R. Doc. 4-9 at p. 3).

[43] *Id.* (*quoting* R. Doc. 4-9 at p. 4).

[44] R. Doc. 4-9 at pp. 4-5.

[45] *Id.* at p. 4.

attachments thereto in addition to the exhibits attached by [Claimants], shows that these barges are not vessels under maritime law."[46]

In response, ACBL merely asserts that the Motion should be denied because it has sufficiently alleged a cognizable claim for limitation and/or exoneration of liability.[47]   ACBL alternatively argues that "summary judgment is premature [because] genuine issues of material fact exist regarding the physical characteristics and activities of the barges . . . compris[ing] the Wash Dock."[48]   ACBL asserts that the test for vessel status is a fact-intensive inquiry, and that Claimants have not presented enough factual evidence to satisfy the high burden imposed by Fed. R. Civ. P. 56.[49]   ACBL claims that, "there has been zero discovery or analysis at this early stage of the physical characteristics of each of the ACBL barges, the movements of those barges, or the ease with which those barges have or could be detached from their moorings."[50]   Relying upon the declaration of its facility manager, Kurt Kienitz, ACBL asserts that the Barges could be detached from their moorings "with significant ease," and that there were no permanent fixtures that attached the Barges to the shore or river bottom.[51]   ACBL also asserts that while barge STC 2717 was connected to an onshore power supply, "[d]isconnecting the power supply requires only that a handful of wires be disconnected from the receptacles located on barges STC 2717 and MM 27."[52]   In addition, ACBL denies that the Wash Dock has been in the same

---

[46] R. Doc. 4-1 at p. 14.
[47] R. Doc. 7 at pp. 2-7.
[48] *Id.* at pp. 7-13.
[49] *Id.* at pp. 8 & 10.
[50] *Id.* at p. 10.
[51] *Id.* at p. 11 (*citing* R. Doc. 7-1 at ¶¶ 4-5).
[52] R. Doc. 7 at p. 12 (*citing* R. Doc. 7-1 at ¶¶ 6-7).

configuration since 2009, and explains that it has "made significant changes to the Wash Dock" since "ACBL purchased the Convent fleeting facility [(the Barges)]."[53] These "significant changes" include "moving barges in and out of the Wash Dock string," and "the placement of two *raked bow* vessels at the head of the Convent Wash Dock."[54]  Furthermore, according to ACBL, a total of three barges with raked bows were included in the Wash Dock at the time of the incident on or about August 29, 2021.[55]

On June 6, 2022, the Court allowed ACBL to file a Supplemental Memorandum in opposition to the Motion, in which ACBL asserts that the Claimants' challenge to ACBL's Verified Complaint is premature and that the Court should deny the Motion because Claimants have not filed a separate claim and are not yet a party to this lawsuit.[56]  ACBL contends that the "record in this Limitation Action established that [Claimants] have failed to file any claim in this action that complies with the requirements of Supplemental Rule F(5)," which governs the Limitation of Shipowners' Liability Act.[57]  In its attached Supplemental and Amended Statement of Contested Material Facts, ACBL reiterates that the Wash Dock is in a different configuration since ACBL purchased the Barges from AEP, explaining that the "Barges have been moved in and out of the wash dock since 2009."[58]

---

[53] R. Doc. 7 at p. 12 (*citing* R. Doc. 7-1 at ¶ 13).
[54] R. Doc. 7 at p. 12 (emphasis added) (*citing* R. Doc. 7-1 at ¶ 13).
[55] The three barges with "raked bows" were (1) the STC 2717, (2) the STC 2715, and (3) the JPW 129. R. Doc. 7 at p. 12 (*citing* R. Doc. 7-1 at ¶ 13).
[56] R. Docs. 11, 12, & 13.  *See,* R. Doc. 13 at pp. 2-4.
[57] R. Doc. 13 at p. 2 (*citing* Fed. R. Civ. P. Supp. Adm. Mar. Cl. F(5)).
[58] R. Doc. 13-1 at p. 2.

In response, Claimants assert that "Rule 12 motions are intended to be filed prior to the filing of an answer," and that established jurisprudence permit Claimants to "seek certain relief prior to filing a claim and answer."[59] Claimants argue that, "[v]essel status is a jurisdictional issue under the Limitation of Shipowner's Liability according to . . . the Fifth Circuit."[60] Claimants explain that, "[w]hen determining whether the court has jurisdiction in a limitation action, the claimant bears the burden of proving by a preponderance of the evidence that the court has jurisdiction based on the complaint and evidence."[61] Claimants argue that ACBL "has failed to prove that this Court has jurisdiction to hear this matter because the barges forming the wash dock at issue are not vessels."[62] Accordingly, Claimants contend that they are "entitled to seek dismissal prior to filing a claim and answer when not even Petitioner's own pleadings support the legal conclusion that the wash dock is a vessel."[63]

## II.   LEGAL STANDARD

### A. Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a defendant can seek dismissal of a complaint, or any part of it, for failure to state a claim upon which relief may be granted.[64] To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

---

[59] R. Doc. 16 at p. 3 (*citing In re Complaint & Petition of Triton Asset Leasing GmbH*, 719 F.Supp.2d 753, 758 (S.D. Tex. 2010)).
[60] R. Doc. 16 at p. 3 (*citing In re Southern Recycling, LLC*, 982 F.3d 374, 378 (5th Cir. 2020)).
[61] R. Doc. 16 at p. 4 (*citing In re Southern Recycling, LLC*, 982 F.3d 374, 381-82 (5th Cir. 2020)).
[62] R. Doc. 16 at p. 4.
[63] *Id.*
[64] Fed. R. Civ. P. 12(b)(6).

on its face.'"[65]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[66]

In ruling on a motion to dismiss, the Court accepts all well-pleaded facts as true and views those facts in the light most favorable to the non-moving party.[67]  The Court, however, is not bound to accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.[68]  "Dismissal is appropriate when the complaint on its face shows a bar to relief."[69]  In deciding a Rule 12(b)(6) motion to dismiss, a court is generally prohibited from considering information outside the pleadings, but may consider documents outside of the complaint when they are: (1) attached to the motion; (2) referenced in the complaint; and (3) central to the plaintiff's claims.[70]  The Court can also consider matters of public record and matters subject to judicial notice.[71]

### B. Motion for Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[72]  When assessing whether a

---

[65] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[66] *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (*quoting Ashcroft*, 556 U.S. at 678) (quotation marks omitted).

[67] *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 513 (5th Cir. 2018).

[68] *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).

[69] *Cutrer v. McMillan*, 308 Fed. Appx. 819, 820 (5th Cir. 2009) (quotation and internal quotation marks omitted).

[70] *Maloney Gaming Mgmt., LLC v. St. Tammany Parish*, 456 Fed. Appx. 336, 340–41 (5th Cir. 2011).

[71] *Servicios*, 2013 WL 1513406, at *3.

[72] Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*,

dispute regarding any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[73] While all reasonable inferences must be drawn in favor of the nonmoving party, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions or "only a scintilla of evidence."[74]  Instead, summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party.[75]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."[76]  The non-moving party can then defeat summary judgment by either submitting evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[77] If, however, the nonmoving party will bear the burden of proof at trial on the dispositive issue, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving

---

477 U.S. 242, 247 (1986).

[73] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008) (citations omitted).

[74] *Id.* (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)) (internal quotation marks omitted).

[75] *Delta & Pine Land Co.*, 530 F.3d at 399 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[76] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991).

[77] *Id.* at 1265.

party's claim.[78]  The burden then shifts to the nonmoving party who must go beyond the pleadings and, "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"[79]

### C. The Limitation of Shipowners' Liability Act

The Limitation of Shipowners' Liability Act ("LOLA") provides for limitation by the owner of any vessel when certain criteria are met.[80]  LOLA, however, only applies to "seagoing vessels and vessels used on lakes and rivers or in inland navigation."[81]  The term "vessel" is defined by 1 U.S.C. § 3 to include, "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."[82] This statutory definition, however, has been narrowed through federal jurisprudence which will be discussed further in the Analysis section of this Order.

## III.    ANALYSIS

### A. Claimants are not entitled to dismissal under Fed. R. Civ. P. 12(b)(6).

While *In re Complaint and Petition of Triton Leasing GmbH*, cited by ACBL, suggests that the Claimants lack adequate standing to file a motion to dismiss because Claimants did not "first file a proof of claim and an answer" to ACBL's complaint, the Court finds that the Claimants' Motion is premature on separate

---

[78] *See Celotex*, 477 U.S. at 322-23.
[79] *Id*. at 324 (quoting Fed. R. Civ. P. 56(e)).
[80] 46 U.S.C. § 30502 (2006).
[81] *Id*.
[82] 1 U.S.C. § 3 (1947).

grounds.[83]  The Court's analysis focuses on whether ACBL's Verified Complaint for Exoneration From, or Limitation of Liability adequately meets the Limitation of Shipowners' Liability Act's pleading requirements and whether there is a genuine issue of material fact concerning the Barges' vessel status.  For a shipowner to avoid or limit their liability under the Limitation of Shipowners' Liability Act, the vessel must be a "watercraft *practically capable* of maritime transportation."[84]  Thus, whether ACBL's Verified Complaint for Exoneration From or Limitation of Liability survives the Claimants' Rule 12(b)(6) Motion to Dismiss requires, in part, a determination of the Barges' vessel status.

ACBL contends that the Claimants' Motion to Dismiss should be denied because "it has sufficiently alleged a cognizable claim for limitation and/or exoneration of liability."[85]  The procedures governing a complaint brought under the Limitation of Shipowners' Liability Act are set forth in Rule F(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Rule F").[86]  Under Rule F, a vessel owner seeking limitation must file a complaint "sett[ing] forth the facts on the basis of which the right to limit liability is asserted and all facts necessary to enable the courts to determine the amount to which the owner's liability

---

[83] *In re Complaint and Petition of Triton Leasing GmbH*, 719 F.Supp.2d 753, 758 (S.D. Tex. 2010). Claimants argue that the have adequate standing because there are challenging whether the Court has proper admiralty jurisdiction under 28 U.S.C. § 1333. *See In re Silver Slipper Casino Venture, LLC*, 264 Fed. Appx. 363 (5th Cir. 2008). However, Claimants have not filed an amended or supplemental memorandum seeking a Rule 12(b)(1) motion to dismiss based on jurisdiction. Moreover, whether admiralty jurisdiction arises under 28 U.S.C. § 1333 depends on whether the Barges are vessels, and that determination cannot be made at this time.  Nevertheless, the Court finds the Claimants' Motion is premature and should be denied on separate grounds.
[84] *Dutra*, 543 U.S. at 497 (emphasis added); 46 U.S.C. § 30502 (2006); 1 U.S.C. § 3 (1947).
[85] R. Doc. 7 at pp. 2-7.
[86] Fed. R. Civ. P. Supp. Adm. Mar. Cl. F(2).

shall be limited."[87]  Rule F does not require a shipowner prove the vessel status of its ships in a verified complaint for limitation of liability.[88]  Moreover, in deciding a Rule 12(b)(6) motion to dismiss, the Court is generally prohibited from considering information outside the pleadings.[89]

ACBL has met all of the requisite pleading requirements in its Verified Complaint For Exoneration From or Limitation of Liability.  Specifically, the Verified Complaint states that the Barges were damaged because of the incident, were valued at $945,000 at the close of their voyage, and had no pending freight.[90]  ACBL provided the specific value of each barge[91] and ACBL pleaded that it was, at the time of filing its Verified Complaint, "unaware of any suits, petitions, demands, unsatisfied claims of liens, or liens against the Vessel in connection with the Incident."[92]  Moreover, ACBL satisfied the requisite notice pleading requirement,[93] and explained that ACBL exercised due diligence to maintain the Barges in a seaworthy condition and that the incident was not caused by any fault or negligence on the part of ACBL and occurred without its privity or knowledge.[94]  None of the cases cited by Claimants involve a determination of vessel status in connection with a 12(b)(6) motion to dismiss for failure to state a claim, and the Court is not aware of any such cases.  Thus, for the

---

[87] Fed. R. Civ. P. Supp. Adm. Mar. Cl. F(2).
[88] *See* Fed. R. Civ. P. Supp. Adm. Mar. Cl. F.
[89] *Maloney Gaming Mgmt.,* LLC, 456 Fed. Appx. at 340–41.
[90] R. Doc. 1 at ¶¶ 8, 16 and 17. These pleading requirements are outlined in Rule F(2). *See* Fed. R. Civ. P. Supp. Adm. Mar. Cl. F(2).
[91] R. Doc. 1-3. *See* Fed. R. Civ. P. Supp. Adm. Mar. Cl. F(2).
[92] R. Doc. 1 at ¶ 11; *See* Fed. R. Civ. P. Supp. Adm. Mar. Cl. F(2).
[93] R. Doc. 1 at ¶ 5; *See* Fed. R. Civ. P. Supp. Adm. Mar. Cl. F(4).
[94] R. Doc. 1 at ¶¶ 4 and 12; Fed. R. Civ. P. Supp. Adm. Mar. Cl. F.

foregoing reasons, the Court denies Claimants' Motion to Dismiss Pursuant to Rule 12(B)(6).

## B. Claimants are not entitled to summary judgment under Fed. R. Civ. P. 56

ACBL contends that Claimants' Motion for Summary Judgment should be denied as premature because "genuine issues of material fact exist regarding the physical characteristics and activities of the barges . . . compris[ing] the Wash Dock."[95]  ACBL asserts that the test for vessel status is a fact-intensive inquiry, and that Claimants have not presented enough factual evidence to satisfy the high burden imposed by Fed. R. Civ. P. 56.[96]  The Court agrees.

Given the jurisprudence discussed in the Court's analysis of the Limitation of Shipowners' Liability Act and the evidence before the Court, it is unclear whether the Wash Dock was a vessel at the time of the incident, as some of the attached exhibits suggest the Wash Dock was merely a floating work platform.[97]  However, this does not extinguish the possible existence of a genuine issue of material fact.  The term "vessel" is defined by 1 U.S.C. § 3 to include, "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."[98]  According to the Supreme Court, the term "vessel" includes "any watercraft *practically capable* of maritime transportation, regardless of its primary purpose or

---

[95] R. Doc. 7 at pp. 7-13. ACBL further claims that "there has been zero discovery or analysis at this early stage of the physical characteristics of each of the ACBL barges, the movements of those barges, or the ease with which those barges have or could be detached from their moorings." *Id.* at p. 10.
[96] *Id.* at pp. 8 & 10.
[97] The Barges "do not feature propulsion." R. Doc. 4-1 at p. 12 (internal quotation marks omitted) (*citing* R. Doc. 4-9 at p. 4). The Barges were connected to local utilities. R. Doc. 4-1 at p. 12 (*citing* R. Doc. 4-9 at p. 4); R. Doc. 7 at p. 12 (*citing* R. Doc. 7-1 at ¶¶ 6-7).
[98] 1 U.S.C. § 3 (1947).

state of transit at a particular moment."[99] The Supreme Court further explained that a "watercraft is not capable of being used for maritime transport in any meaningful sense if it has been *permanently moored* or otherwise rendered *practically incapable* of transportation or movement."[100]  In *Stewart v. Dutra Const. Co.*, the Supreme Court concluded that a harbor dredge was a vessel because it was used, or was capable of being used, to transport equipment and crew over water at the time of the plaintiff's injury.[101]  The Supreme Court stated that a structure may qualify as a vessel even if attached—but not "permanently" attached—to land or ocean floor.[102]

In *Lozman v. City of Riviera Beach, Fla.*,[103] the Supreme Court explained that a structure does not qualify as a "vessel" "unless a *reasonable observer*, looking at the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water."[104]  The Supreme Court ultimately determined that a houseboat with "no rudder or steering mechanism," that had an unraked hull, was incapable of "self-propulsion," whose rooms "looked out upon the world, not through watertight portholes, but through French doors or ordinary windows," which had "traveled by tow over water . . . on only four occasions over a period of seven years" was not designed to any practical degree to transport

---

[99] *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 497 (2005) (emphasis added).
[100] *Id.* at 494 ("ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again") (emphasis added); *see Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 570 (5th Cir. 1995) (floating casino was no longer a vessel where it "was moored to the shore in a semi-permanent or indefinite manner").
[101] *Dutra*, 543 U.S. at 497 and 485 (the dredge moved over water "every couple of hours").
[102] *Id.* at 493-94.
[103] *Lozman v. City of Riviera Beach, Fla.*, 568 U.S. 114 (2013).
[104] *Id.* at 121; *see* 1 U.S.C. § 3 (1947).

persons or things over water, and thus did not qualify as a "vessel."[105]  The Supreme Court further explained that, "we can find nothing about the [houseboat] that could lead a reasonable observer to consider it designed to a practical degree for transportation on water."[106]  In doing so, the Supreme Court focused on the "physical attributes and behavior of the structure, as objective manifestation of any relevant purpose, and not to the subjective intent of the owner." [107]  The Court finds that *Lozman* is distinguishable from the facts of this case, since vessel status was ultimately determined by the Supreme Court after full discovery had been completed.[108]

A recent case from the Eastern District of Louisiana provides further guidance for determining whether a floating "work platform" is a vessel.   In *Badeaux v. Eymard Brothers Towing Company Inc.*,[109] relied on by Claimants in support of their Motion, another Section of this Court was tasked with determining "whether [a] spar barge is a vessel, governed by general maritime law, or a dock, governed by state law."[110]  The court explained that, "To determine whether a structure is a vessel or a dock, the Court must consider 'the purpose for which the craft is constructed and the

---

[105] *Lozman*, 568 U.S. at 121-23.

[106] *Id.* at 122.

[107] *Id.* at 128. "A craft whose physical characteristics and activities objectively evidence a waterborne transportation purpose or function may still be rendered a non-vessel by later physical alterations." *Id.* at 129.

[108] *Id.* at 118-119. In *Lozman*, the district court granted summary judgment, the appellate court affirmed, and summary judgment was reversed by the Supreme Court and the case was remanded. *Id.*

[109] *Badeaux v. Eymard Brothers Towing Company Inc.*, Civ. A. No. 19-13427, 2021 WL 5564459, at *1 (E.D. La. Nov. 29, 2021) (Vance, J.).

[110] "Absent a maritime status between the parties, a dock owner's duty to crew members of a vessel using the dock is defined by the application of state law, not maritime law." *Id.* at *9 (quoting *Fla. Fuels, Inc. v. Citgo Petroleum Corp.*, 6 F.3d 330, 332 (5th Cir. 1993)) (internal quotation marks omitted). "The Fifth Circuit has held that piers and docks are extensions of the land." *Badeaux*, Civ. A. No. 19-13427, 2021 WL 5564459 at *9.

business in which it is engaged."[111]  Following a bench trial, Judge Vance made the

following determination:

> Floating platforms are generally not vessels when they (i) are
> constructed and used primarily as work platforms, (ii) are moored or
> otherwise secured at the time of the accident, and when, (iii) although
> capable of movement across navigable waters, any transportation
> function they performed was merely incidental to their primary
> purpose.[112]

Judge Vance ultimately determined that the barge was not a vessel, because the

barge was attached to the river with iron spuds[113] and its "ability to move was merely

incidental to its primary purpose."[114]

In a similar case, *Baker v. Director, Office of Workers' Compensation

Programs*,[115] the Fifth Circuit was tasked with deciding whether a tension leg

offshore oil platform was a vessel.[116]  The Fifth Circuit explained that, "[f]or purposes

of the Jones Act, a vessel is defined as a 'structure[ ] designed or utilized for

transportation of passengers, cargo or equipment from place to place across navigable

waters.'"[117]  The Fifth Circuit held that the offshore oil platform was not a vessel;

---

[111] *Badeaux*, Civ. A. No. 19-13427, 2021 WL 5564459 at *9 (*quoting Burchett v. Cargill, Inc.*, 48 F.3d 173, 176 (5th Cir. 1995) (internal quotation marks and internal citation omitted)).
[112] *Badeaux*, Civ. A. No. 19-13427, 2021 WL 5564459 at *9 (*quoting Burchett v. Cargill, Inc.*, 48 F.3d 173, 176 (5th Cir. 1995) (internal quotation marks omitted); *see Daniel v. Ergon, Inc.*, 892 F.2d 403, 407 (5th Cir. 1990) (structure at issue and determined not to be a vessel was a floating barge cleaning and stripping platform utilized to strip cargo from barges and gas free their cargo tanks. The barge was moored to steal pilings along shore; it had no crew quarters, propulsion power or navigation lights. Electrical lines, washwater lines, slop lines, discharge lines, and steam and oil transfer lines ran from the barge to shore. Additionally, the barge was never used as a moving transportation unit).
[113] *Badeaux*, Civ. A. No. 19-13427, 2021 WL 5564459, at *9 (the barge was spudded in place at the time of the plaintiff's accident and could move only vertically).
[114] *Id.* (internal quotation marks omitted). In *Badeaux*, full discovery had completed before the court reached its determination of vessel status during the bench trial.
[115] 834 F.3d 542 (5th Cir. 2016).
[116] *Baker*, 834 F.3d at 542.
[117] *Id.* at 547 n. 4 (*quoting Bernard v. Binnings Cost. Co., Inc.*, 741 F.2d 824 (5th Cir. 1984)) (internal quotation marks omitted).

although the platform was required to carry a captain and crew when towed, the platform had no means of self-propulsion, had no steering mechanism or rudder, had an unraked bow, and was intended to travel over water only once in twenty years.[118] The Court finds *Baker* distinguishable from the facts of this case because the Fifth Circuit's ruling followed full discovery, a formal hearing with an Administrative Law Judge, and review by the Benefits Review Board.[119]

Here, the parties dispute whether the Barges at issue can be detached from their mornings and the level of difficulty that would require.  ACBL claims that, "there has been zero discovery or analysis at this early stage of the physical characteristics of each of the ACBL barges, the movements of those barges, or the ease with which those barges have or could be detached from their moorings."[120] Relying upon the declaration of its facility manager, Kurt Kienitz, ACBL asserts that the Barges could be detached from their moorings "with significant ease," and that there were no permanent fixtures that attached the Barges to the shore or river bottom.[121]  However, Claimants, relying on a marine surveyor's report prepared by Matthew Knoll, contend that "the barges are not capable of navigation without significant efforts to disassemble their permanent moorings and utilities."[122]  This discrepancy, among other factual disputes related to whether the Wash Dock is a vessel, constitute genuine issues of material fact as to whether the Barges were

---

[118] *Baker*, 834 F.3d at 545-46.
[119] *Id.* at 544-45.
[120] R. Doc. 7 at p. 10.
[121] *Id.* at p. 11 (*citing* R. Doc. 7-1 at ¶¶ 4-5).
[122] *Id.* (*quoting* R. Doc. 4-9 at p. 4).

permanently moored and the level of difficulty associated with removing the Barges from their moorings. While this is one of many factors that the Courts considers when determining an object's vessel status, it nonetheless represents a remaining, genuine issue of material fact, defeating summary judgment. While Claimants rely on Judge Vance's ruling in the *Badeaux* case, the Court notes the different posture of that case when that ruling was issued. Indeed, that ruling followed full discovery during the two-years the matter was pending, a two-day bench trial, and consideration of the evidence introduced at that trial. Neither the parties nor the Court have had the benefit of completed discovery in the matter before the Court.[123] Furthermore, the parties dispute if and how far the Barges have moved since 2009, illustrating the existence of an additional, genuine issue of material fact.[124] Thus, summary judgment is premature and not warranted at this time. Accordingly, the Court denies the Claimants' Motion for Summary Judgment.

---

[123] *See* R. Doc. 69. Discovery must be completed by June 12, 2023. This case is also distinguishable from the *Lozman* and *Baker* cases, both of which the Claimants rely on. In *Lozman*, summary judgment was awarded by the district court, affirmed by the circuit court, and reversed by the Supreme Court; full discovery was completed before the Supreme Court's decision. Similarly, *Baker* is distinguishable from this case, as the Fifth Circuit's ruling followed full discovery, a formal hearing with an Administrative Law Judge, and review by the Benefits Review Board.

[124] Relying upon the declaration of its facility manager, Kurt Kienitz, ACBL argues that the Barges have been moved since 2009. R. Doc. 7 at p. 12 (*citing* R. Doc. 7-1 at ¶ 13). Claimants, relying on the survey attached to the Verified Complaint, contend that the Wash Dock has been in its same configuration since 2016. R. Doc. 4-1 at p. 10 (*citing* R. Doc. 4-4 at p. 12; R. Doc. 4-5).

IV.    **CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants'
Motion to Dismiss Pursuant to Rule 12(B)(6) and Alternatively, a Motion for
Summary Judgment[125] is **DENIED**.

New Orleans, Louisiana, March 31, 2023.

**WENDY B. VITTER**
**United States District Judge**

---

[125] R. Doc.4.